<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFF BRAUN, | : |
| | : |
| Plaintiff, | :     **Civil Action No. 12-6224 (ES)(JAD)** |
| | : |
| v. | : |
| | :     <u>OPINION</u> |
| DANIEL S. SCHWARTZ and DALE | : |
| WEINGARTEN, JOHN DOES 1 | : |
| through 10 (fictitious individuals), and | : |
| ABC ENTITIES 1 through 10 (fictitious | : |
| entities), | : |
| | : |
| Defendants. | : |
| | : |

<u>SALAS, District Judge</u>

## I.      Introduction

This matter comes before the Court on two separately-filed motions to dismiss: (1) Defendant Daniel S. Schwartz's Motion to Dismiss the Complaint Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, (D.E. No. 9); and (2) Defendant Dale Weingarten's Motion to Dismiss, (D.E. No. 10).   The Court has considered the parties' submissions in support of and in opposition to the instant motion, and decides the matter without oral argument pursuant to Fed. R. Civ. P. 78(b).   For the reasons set forth below, Schwartz and Weingarten's motions to dismiss Plaintiff's Complaint are GRANTED.

## II.      Jurisdiction

Jurisdiction in this matter is grounded in federal question, 28 U.S.C. § 1331, and the Court has supplemental jurisdiction with respect to the state law claims pursuant to 28 U.S.C. § 1367.

III.   **Factual Background and Procedural History**[1]

Plaintiff Jeff Braun ("Plaintiff" or "Braun") brings federal and state law claims stemming from the alleged false representations of Defendants, Dale Weingarten ("Weingarten") and Daniel S. Schwartz ("Schwartz") (collectively, "Defendants"), in connection with an investment in a sports training and tournament park.

Weingarten worked at and was intimately familiar with the operations of the Golden Goal Tournament Park (the "Sports Park"). (Complaint ("Compl.") ¶¶ 10-11, D.E. No. 1). The Sports Park is located in Fort Ann, New York and was owned by Golden Goal, LLC ("Golden Goal"), a New York limited liability company. (*Id.* ¶¶ 9-10). Under the Golden Goal's operation, the Sports Park failed as a business. (*Id.* ¶¶ 12-13).

Sometime in 2010, Weingarten leased the Sports Park with his "silent partner" Schwartz under a New Jersey limited liability company, Golden Sports Tournament Park, LLC ("Golden Sports"). (*Id.* ¶¶ 14, 17). Thereafter, Weingarten acquired the right to purchase the Sports Park and its assets, but Schwartz was unwilling to finance the new venture. (*Id.* ¶ 19).

On September 30, 2010, Weingarten emailed Braun with a business proposal (the "Business Plan") involving the acquisition of the "real property in Fort Ann, New York, and to join Weingarten in running the business of the Sports Park located on the property." (*Id.* ¶¶ 12, 20-21; Ex. A, Business Plan). The Business Plan represented that the investment would be substantially profitable from its inception. (Compl. ¶ 22).

On October 4, 2010, Braun met with Weingarten and Schwartz to discuss the business proposal. (*Id.* ¶ 23). According to Braun, "Weingarten and Schwartz proposed that Braun would

---

[1] Unless otherwise indicated, the factual background set forth here is drawn from the Complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

purchase real estate and the existing assets of the Sports Park . . . for $2,475,000," and "Weingarten would operate the day-to-day operations of [the] Sports Park." (*Id.* ¶ 32). Defendants described the investment as a "'turnkey profit center' that required limited start up money because the existing business was already in place." (*Id.* ¶ 43). Weingarten and Schwartz represented that the business "'experienced significant growth'" in 2008, but that a "'difference in management philosophy' . . . 'left the company in a vulnerable state.'" (*Id.* ¶ 70-72 (quoting Business Plan)). Defendants maintained that "once Weingarten gained full control of the operations," the Sports Park would earn large profits. (*Id.* ¶ 77). Indeed, Weingarten and Schwartz projected that the Sports Park would "generate $1,475,000 in revenue with $600,000 in net profit" during the first year. (*Id.* ¶ 47).

According to Braun, Defendants also "falsely projected that the Sports Park could generate $4 million in annual program sales," and "total revenues starting in the one million-dollar range in 2011 and exceeding $2,500,000 by 2014." (*Id.* ¶¶ 80, 82 (citing Business Plan)). Braun claims that he relied on Schwartz's reputation as a successful financial advisor and securities broker, as well as Weingarten's extensive experience in the Sports Park's operations and as a "seasoned sports professional" with ties to the sports community. (*Id.* ¶¶ 28, 33-36, 39-40). Based on the misrepresentations made at the October 4, 2010 meeting, as well as in the Business Plan, Plaintiff alleges that Defendants fraudulently induced him to purchase the Sports Park and offer Weingarten an interest in the operating company. (*Id.* ¶ 98).

Shortly after the October 4, 2010 meeting, Weingarten advised Braun that he had obtained an option to purchase the Sports Park, and had paid $100,000 as a deposit to secure the option. (*Id.* ¶¶ 99-100). On October 25, 2010, Braun deposited $25,000 to extend the option for

a few days.  (*Id.* ¶¶ 103, 105).   Braun alleges that Schwartz claimed he had a conflict that prevented him from investing in this business venture.  (*Id.* ¶ 106).

Accordingly, Braun and Weingarten moved forward with the investment opportunity without Schwartz and formed a land holding company and an operating company for the real estate and business, respectively.  (*Id.* ¶ 107).  Brown & Green Realty, LLC d/b/a Brown & Green Fort Ann, LLC ("B&G"), a New York limited liability company, held the real estate and assets of the Sports Park.  (*Id.* ¶ 108).  JD Sports Park, LLC ("JD"), a New York limited liability company, operated the Sports Park.  (*Id.* ¶ 110).  Weingarten sought 50% ownership and management control of the land and operating companies, but Braun rejected those terms.  (*Id.* ¶ 112).  Instead, pursuant to the operating agreement (the "B&G Operating Agreement") created for B&G, Braun received 99% ownership of B&G, and Weingarten received 1% with an option to purchase up to 49% of the holding company.  (*Id.* ¶ 114).  Although Braun agreed to give Weingarten 49% interest in JD under the condition that Weingarten would assume that share of all costs and any losses, an operating agreement was never executed.  (*Id.* ¶¶ 117-18).  At closing, Braun paid $2,475,000 toward the purchase of the real estate; Weingarten contributed $25,000.  (*Id.* ¶ 113).

Braun was named the sole controlling member of both B&G and JD.  (*Id.* ¶ 115).  Weingarten was responsible for running the day-to-day operations associated with JD, including sales, advertising, retaining and paying vendors and staff, paying rent and all other expenses of the Sports Park, and utilizing his expertise, skills, and contacts to book events.  (*Id.* ¶¶ 116, 126).

By mid-2011, Braun alleges that the Sports Park was failing and had never met any of his expectations as represented by Defendants and set forth in the Business Plan.  (*Id.* ¶¶ 128, 134).  Instead of generating profits and as a result of the steadily reduced revenues, Braun advanced

personal loans to operate the business totaling $343,000 within its first year of operation. (*Id.* ¶¶ 129, 134, 137-47, 149).  Despite these efforts, JD became insolvent in November 2011 with a deficit of $300,000—almost a million-dollar deviation from Defendants' projections.  (*Id.* ¶¶ 130-31).  From December 2011 through January 2012, Weingarten refused to produce and maintain accurate financial records and withheld event contracts, client checks, and deposit receipts.  (*Id.* ¶¶ 150-53).  Weingarten used event schedule contracts to falsely project revenue and misappropriate corporate funds.  (*Id.* ¶¶ 154, 159-60).

In January 2012, based upon JD's insolvency and Weingarten's unwillingness to modify the current operations, Braun's counsel issued notices to Weingarten in which he announced his intention to hold a "special meeting" for B&G and JD, whereby B&G would terminate its lease with JD and JD would vote to sell its assets.  (*Id.* ¶ 167).  In an email dated January 20, 2012, Schwartz objected, stating that he and Weingarten were partners, owning 49% of JD and that they were entitled to run the Sports Park for several years before it would meet their expectations.  (*Id.* ¶¶ 168-70; Ex. B, E-mail correspondence from Schwartz dated Jan. 20, 2012 ("E-mail"), D.E. No. 1-3).  Over Defendants' objections, Braun formed a new operating company, Golden Fields, LLC ("Golden Fields"), to transfer the assets of JD and in an attempt to save the Sports Park.  (*Id.* ¶¶ 167, 179).

On October 4, 2012, Plaintiff filed a complaint asserting twenty counts: (1) a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5(b), (Count One); (2) liability for aiding and abetting in violation of Rule 10b-5 of the Exchange Act, (Count Two); (3) violations of the New Jersey Uniform Securities Law, N.J.S.A. § 49:3-47, *et seq.*, (Count Three); (4) a violation of N.J.S.A. § 49:3-60 for the offer/sale of unregistered securities, (Count Four); (5) a

violation of N.J.S.A. § 49:3-56 for unregistered persons affecting securities transactions, (Count

Five); (6) liability for aiding and abetting in violation of N.J.S.A. § 49-3-47, *et seq.*, (Count Six);

(7) violations of New Jersey Civil Racketeering Act, N.J.S.A. § 2C:41-1, *et seq.*, (Count Seven);

(8) civil conspiracy, (Count Eight); (9) fraudulent inducement, (Counts Nine and Ten); (10)

common law fraud, (Count Eleven); (11) breach of fiduciary duty, (Count Twelve); (12) tortious

interference with prospective economic advantage, (Count Thirteen); (13) tortious interference

with contractual relations, (Count Fourteen); (14) unjust enrichment seeking a constructive trust

and/or equitable lien as a remedy, (Counts Fifteen and Sixteen); (15) equitable estoppel, (Count

Seventeen); (16) specific performance to enjoin Defendants from asserting an interest in B&G or

JD and from interfering with Golden Fields, (Count Eighteen); and (17) specific performance to

dissolve B&G and compel Weingarten to sell his share in B&G, (Count Nineteen); and (18)

common law ejectment, (Count Twenty).[2]

## IV.    Standards of Review

### A.    12(b)(6)

Defendants move to dismiss the first two counts under Rule 12(b)(6).  Federal Rule of

Civil Procedure 8(a)(2) requires a complaint to set forth "a short and plain statement of the claim

showing that a pleader is entitled to relief."  The pleading standard announced by Rule 8 does not

require detailed factual allegations; however, it does demand "more than an unadorned, the-

defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[2] Defendant Schwartz also notes that on March 5, 2012, Weingarten, individually and derivatively on behalf of JD and B&G, commenced a civil action against Braun and others in New York State Court in which Weingarten alleges that Braun engaged in wrongful conduct and self-dealing.  (Brief in Support of Defendant Daniel S. Schwartz's Motion to Dismiss the Complaint Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Schwartz Br.") 7, D.E. No. 9-2).  For purposes of this motion, the Court accepts this procedural history, but finds it immaterial to its disposition of the instant motion.

(internal citation omitted).  In addition, the plaintiff's short and plain statement of the claim must "give the defendants fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal citation omitted).

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).  But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Furthermore, a district court deciding a motion to dismiss generally does not consider material beyond the pleadings.  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "[When] deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached [thereto], matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2011).  "[A]n exception to the general rule is that a

document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1426 (emphasis in original) (citation omitted & internal quotation marks omitted).   "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

> **B.       12(b)(1)**

Defendants move to dismiss the state law claims for lack of subject matter jurisdiction under Rule 12(b)(1).  A motion to dismiss pursuant to Rule 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction.  "When subject matter jurisdiction is challenged under Rule 12(b) (1), the plaintiff must bear the burden of persuasion."  *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 191 n.4 (3d Cir. 2011) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).  In considering a Rule 12(b)(1) motion, "the district court may not presume the truthfulness of plaintiff's allegations, but rather must 'evaluat[e] for itself the merits of [the] jurisdictional claims.'"  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

**V.       Analysis**

> **A.       Violation of Section 10(b) of the Exchange Act and Rule 10b–5**

Defendants argue that Plaintiff fails to state a plausible claim in counts one and two because the Sports Park, its assets and the revenue generated from the business are not "securities" under federal securities law.   (Schwartz Br. 10; Defendant Dale Weingarten's Brief in Support of Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ("Weingarten Br.") 8, D.E. No. 10-1).   In particular, Defendants contend, and Plaintiff

concedes, that "this case does not involve stocks or bonds but rather the investment of monies in a sports tournament park." (Schwartz Br. 11; Weingarten 11; Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss ("Pl. Opp.") 11, D.E. No. 23). Plaintiff argues that his ownership interest was an investment contract and that he was "attracted solely by the prospect of a return on [his] investment from the entrepreneurial and managerial efforts of others." (Pl. Opp. 11, 14). Defendants argue that Plaintiff "was not a passive investor in [the Sports Park] such that he could expect profits 'solely from the efforts of others.'" (Schwartz Br. 14 (citation omitted); Weingarten Br. 15-16). Therefore, there dispute herein hinges on whether the agreement to operate the Sports Park constitutes an investment contract within the meaning of the Exchange Act.

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Securities and Exchange Commission, makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> *in connection with the purchase or sale of any security*.

17 C.F.R. § 240.10b–5 (emphasis added).

It is axiomatic that before a plaintiff can invoke the protections of the anti-fraud provisions of the federal securities laws, a plaintiff must show that the alleged misconduct involves a purchase or sale of *securities.  See Steinhardt Grp. Inc. v. Citicorp,* 126 F.3d 144, 150 (3d Cir. 1997); *Scattergood v. Perelman,* 945 F.2d 618, 622 (3d Cir. 1991) (fraud under the Exchange Act and Rule 10b-5 must concern the purchase or sale of a "security").   Indeed, in order to state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must allege that defendants: (1) made a misstatement or an omission of material fact; (2) with scienter; (3) *in connection with the purchase or the sale of a security*; (4) upon which the plaintiff reasonably relied; and (5) plaintiff's reliance was the proximate cause of his injury.  *In re Westinghouse Secs. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996).

The Exchange Act defines a "security" as:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (emphasis added).  Further, although the Exchange Act "was adopted to restore investors' confidence in the financial markets, and the term 'security' was meant to include 'the many types of instruments that in our commercial world fall within the ordinary

concept of a security,' . . . the scope of federal securities laws is not without limitation, and Congress did not intend to create a federal cause of action for common fraud." *Goodwin v. Elkins & Co.*, 730 F.2d 99, 102 (3d Cir. 1984) (citation omitted).

Moreover, although the term "investment contract" has not been defined by Congress, the Supreme Court set forth the three factors for determining whether an investment constitutes a security: (1) "an investment of money," (2) "in a common enterprise," and (3) "with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *see also Steinhardt Grp. Inc.*, 126 F.3d at 151 (same). The parties do not dispute the first two prongs of the *Howey* test. Therefore, the Court will now consider the third factor of the *Howey* test.

In analyzing the third factor of the *Howey* test, courts have considered "whether the investor has meaningfully participated in the management of the [corporate entity] in which it has invested such that it has more than minimal control over the investment's performance." *Steinhardt Grp. Inc.*, 126 F.3d at 152 (citation omitted). In *Steinhardt Group Inc.*, the plaintiff, an investment firm, held a 98.79% interest in a limited partnership that was formed to create an investment vehicle for issuing debt and equity securities to investors. *Id.* at 145-46. Steinhardt alleged that the defendant actively concealed information to induce it to invest in the limited partnership in violation of section 10(b) of the Exchange Act and Rule 10b-5. *Id.* at 147. The Third Circuit affirmed the district court's dismissal of the complaint, holding that given the economic realities of a transaction as a whole, a limited partner who had retained control over his investment in a limited partnership could not "be deemed a passive investor under *Howey* and its progeny." *Id.* at 145. The Third Circuit also held that it was irrelevant whether or not Steinhardt in fact exercised its rights, because the relevant inquiry was what "legal rights and powers [were]

11

enjoyed by the investor." *Id.* (quoting *Goodwin*, 730 F.2d at 107).  The court explained that "the

rights and powers assigned to Steinhardt under the [Limited Partnership Agreement]," which

established the powers of the partners and governed the inquiry, "were not nominal, but rather

were significant and, thus, directly affected the profits it received from the Partnership."  *Id.* at

155.   Accordingly, Steinhardt was not a passive investor and the partnership was not an

investment contract under federal securities law.  *Id.* at 154.

Similarly, in *Goodwin*, the plaintiff was a former general partner of a brokerage firm who

alleged he had been fraudulently induced into selling his partnership interest back to the firm

based on misrepresentations made by the defendants in violation of Section 10(b) of the

Exchange Act.  730 F.2d at 101.  There, although the plaintiff alleged standing as a passive

investor, the Third Circuit held that the plaintiff's status as a general partner was fatally

inconsistent with his allegations because a general partner, "as in other similar firms, is

unavoidably, even if unwillingly, a part of the operation of the enterprise."  *Id.* at 102-03.  The

court explained:

> It is manifest that any person who possesses the powers,
> rights, and responsibilities described above cannot have invested
> his capital with the expectation of profits derived *solely* from the
> efforts of others, and therefore cannot be the holder of a "security"
> as intended by the Act.  Whatever subjective perceptions [the
> plaintiff] may have entertained about his position in the firm, and
> whatever may have been the role he actually assumed, the *legal*
> interest which he enjoyed does not fall within the scope of the term
> "security" as intended by Congress.

*Id.* at 104 (emphasis in original).

The Court finds *Great Lakes Chemical Corp. v. Monsanto Co.* persuasive.  96 F. Supp.

2d 376 (D. Del. 2000).  There, the district court considered whether interests in a limited liability

company constituted an investment contract under federal securities law.  *Id.* at 391-92.

Applying the third prong of the *Howey* test, the court observed that the "terms of the operating agreement of each LLC will determine whether its membership interests constitute securities." *Id.* at 392. Thus, "to determine whether a member's profits are to come solely from the efforts of others, it is necessary to consider the structure of the particular LLC at issue, as provided in its operating agreement." *Id.* The district court noted that the members of the limited liability company had no authority to directly manage the entity's business, but they had the power to remove the manage and the power to dissolve the company. *Id.* The plaintiff in *Great Lakes*, in fact, exercised its authority to dissolve the company. *Id.* As such, the court found that the facts were similar to those in *Steinhardt* where the plaintiff had retained significant powers that directly affected the profits it received from the partnership. *Great Lakes*, 96 F. Supp. 2d at 392. Therefore, the district court founds that the investor's profits from the limited liability company did not come solely from the efforts of others, and dismissed the complaint. *Id.*

In the present matter, Braun admits his active involvement in the management of both limited liability companies, acknowledging that he was the controlling and managing member of both companies. (Comp. ¶¶ 107-112; 115). Like in *Great Lakes*, this Court further finds that the operating agreement dictates the structure of the limited liability company and is critical in determining the legal rights and powers of the parties.[3] The operating agreement for B&G provides that Braun is the sole manager of B&G, and confirms that Braun holds a 99%

---

[3] Defendant Schwartz attaches a copy of the B&G Agreement that Plaintiff relies upon in his Complaint, but failed to attach. (Certification of Dale Weingarten ("Weingarten Cert."), Ex. A, B&G Operating Agreement, D.E. No. 9-3). The Court properly considers the B&G Operating Agreement because said document is "integral" to Plaintiff's allegations and "undisputedly authentic." *See Stallings ex rel. Estate of Stallings v. IBM Corp.*, No. 08-3121, 2009 WL 2905471, at *4 (D.N.J. Sept. 8, 2009); *see also Pension Ben. Guar. Corp.*, 998 F.2d at 1196 (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

13

membership interest, while Weingarten holds only 1% interest.   In fact, the B&G Operating

Agreement grants Braun, as manager, the sole power and authority to

> (a) purchase, lease or otherwise acquire from, or sell, lease or
> otherwise dispose of to, any Person any property, (b) open bank
> accounts and otherwise invest the funds of the Company, (c)
> purchase insurance on the business and assets of the Company, (d)
> commence lawsuits and other proceedings, (e) enter into any
> agreement, instrument or other writing, (f) retain accountants,
> attorneys or other agents, (g) borrow money and execute notes and
> mortgage and (h) sell real estate, and (i) take any other lawful
> action that the Managers consider necessary, convenient or
> advisable in connection with any business of the Company.

(B&G Operating Agreement § 4.3 ("Powers of Managers")).   The agreement also provides that

"[n]o person shall have any power or authority to bind the Company unless such Person has been

authorized by the Managers to act on behalf of the Company."   (*Id.* § 4.4 ("Binding Authority")).

Thus, taking his allegations as true, the Court is not persuaded Braun was not an active

participant in the Sports Park since he held significant powers and rights that directly affected the

profits that he could expect to receive.

Even though Plaintiff left the day-to-day management of the business to Weingarten,

Plaintiff held significant rights and powers as the controlling member.   To be sure, the B&G

Operating Agreement granted Plaintiff the right to call meetings and solely establish quorum, (*id.*

§§ 5.2, 5.6), the right to vote at any meeting, (*id.* § 5.7), the right to make distributions in his

discretion, (*id.* § 7.2), and the right to dissolve the company, (*id.* § 10.1(b)).

In regards to JD, Plaintiff's argument also fails.   As an initial matter, Plaintiff did not

purchase or invest any money into JD as required to have standing to bring a federal securities

fraud claim.   *See Scattergood*, 945 F.2d at 621-22 (stating that a claim under the Exchange Act

for securities fraud requires the purchase or sale of a security); *Trump Hotels & Casino Resorts,*

*Inc. v. Resorts Mirage Inc.*, 140 F.3d 478, 485 (3d Cir. 1998) ("[O]nly the purchaser or seller of

a security has standing to bring a private 10b-5 securities fraud action for money damages.")) (citation omitted).  Rather, Plaintiff's investment was limited to $2,475,000 in exchange for his 99% interest *in B&G*.  (Compl. ¶¶ 113-14 (emphasis added)).  Plaintiff also cannot claim that the $343,000 that he advanced to JD as "loans" *after* the formation of JD constituted an "investment" for purposes of bringing his claim.  (*Id.* ¶¶ 137-147).  Therefore, drawing all reasonable inferences in favor of Plaintiff, the Court concludes that Plaintiff did not invest money in JD that would allow him to assert that he "purchased" a security interest in JD and that would give him standing.

Even assuming that Plaintiff did purchase an interest in JD, Plaintiff cannot show that he expected "profits to come solely from the efforts of others."  *Howey*, 328 U.S. at 301.  Plaintiff attempts to argue that he is a passive investor because any control retained in JD was illusory. (Pl. Opp. 16).[4]   But, Plaintiff cannot credibly maintain this argument in light of his pleaded allegations in his Complaint.  Although the parties never executed an operating agreement as to JD, Plaintiff alleged that he was a controlling member of JD and that he held a 51% ownership interest in JD.  (Compl. ¶¶ 115, 117).  Additionally, N.Y. LLC Law § 401(a) provides: "Unless the articles of organization provides for management of the limited liability company by a manager or managers or a class or classes of managers, management of the limited liability

---

[4] The Court also finds Plaintiff's argument, that his control was illusory because he lacked expertise and knowledge to run the Sports Park, improper and unpersuasive.  (Pl. Opp. 21). Plaintiff relies entirely on non-binding case law, and attempts to recast his allegations with this new argument.  *See Penn. ex. rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); *see also McMahon v. Gen. Dynamics Corp.*, No. 12-4994, 2013 WL 1164850, at *13 (D.N.J. Mar. 30, 2013) (finding that court may not consider supplemental factual allegations made by Plaintiff in a certification).

company *shall be vested in its members who shall manage the limited liability company . . . .*" *Id.* (emphasis added).

Plaintiff's argument that he was a passive investor in JD because Weingarten had control of its daily operations is unconvincing.  Notably, the Third Circuit has held that the relevant inquiry is not whether the investor actually exercised control over the company, but rather whether the investor retained legal rights and powers.  *Steinhardt*, 136 F.3d at 155.  That Plaintiff chose to largely remain a passive investor is not sufficient to create a security interest.  *Id.* Nonetheless, Plaintiff cannot claim that he was a passive investor when he alleged that he sought to oust Weingarten, dissolve JD, and approve the sale of its assets to Golden Fields.  (Compl. ¶¶ 167-68).  As such, Plaintiff retained and exercised significant powers on behalf of JD.

Accordingly, this Court finds that Plaintiff cannot allege that he was a passive investor under *Howey* and that his interests in B&G and JD are, therefore, not investment contracts. Plaintiff has not plead sufficient facts to invoke the protections of the Exchange Act.[5]

## B. Counts Three through Twenty

Counts three through twenty of the Complaint assert state law causes of action and are premised on supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Because this Court finds that counts one and two of the Complaint fail to state a claim, there is no federal question

---

[5] Plaintiff further argues that his interests in the limited liability companies may also constitute "stock" under the Exchange Act.  (Pl. Opp. 33).  Plaintiff relies on *Tcherepnin v. Knight* in which the Supreme Court ruled that certain stock-like instruments could be construed as stock under federal securities law.  389 U.S. 332 (1967).  But, Plaintiff also acknowledges that the Supreme Court in *Landreth Timber Co. v. Landreth* explained that this rule only applies to transactions involving traditional stock.  471 U.S. 681, 686-88 (1985).  Therefore, the Court adopts the thorough analysis in *Great Lakes* in which the district court held that limited liability interests are not traditional stock.  96 F. Supp. 2d at 388-89.

jurisdiction under 28 U.S.C. § 1331. Therefore, the Court finds that counts three through twenty

are dismissed for lack of subject matter jurisdiction.

## VI.      Conclusion

For the foregoing reasons, Weingarten and Schwartz's motions to dismiss Plaintiff's

Complaint are granted.  An Order accompanies this Opinion.


_s/Esther Salas_____
**Esther Salas, U.S.D.J.**